LittletoN, Judge,
delivered the opinion of the court:
In the petition filed in this case pursuant to the Joint Eesolution of Congress of June 26,1936, set forth in finding 1, plaintiff seeks to have this court find and report to Congress that by reason of the actions of the Federal Farm Board between July 15, 1929, and July 1, 1930, and the alleged representations and promises of the chairman of the Board about January 17, 1930, it suffered loss and damage in the total amount of $3,000,000, and that it is legally, equitably, and morally entitled to reimbursement for this loss by the United States with interest at 6 per centum per annum from July 1, 1930. In the alternative, plaintiff claims that for the reasons mentioned it should be reimbursed by the United States for a loss of at least $1,064,852.21 with interest.
Plaintiff contends that the Federal Farm Board, organized under the act of June 15, 1929, sought the grain cooperatives, and in particular the plaintiff, to withhold grain from the market, thereby cooperating with and becoming a part of the Federal Farm Board’s stabilization program; that markets were falling badly, a stock-market crash having occurred in the fall of 1929, and financial matters generally in the country were in chaos and confusion; that plaintiff’s president, George Duis, during the last three months of 1929 and in January 1930, conferred with Mr. Legge, the chairman of the Federal Farm Board, acquainting him with the large amount of grain which plaintiff was withholding from the market, in storage, and refraining from selling for its members, thereby incurring great expense to the plaintiff in *679 the process; that plaintiff’s president was assured by Mr. Legge that the plaintiff association would be taken care of; that the Federal Farm Board would meet the losses of the cooperatives; that the Board would take care of all plaintiff’s operating charges and all the advances made by plaintiff to the farmer members who delivered their grain to plaintiff, and that plaintiff would not lose any money on the Federal Farm Board program; that the Farm Board would pay back to plaintiff what had been advanced to the farmers and. everything for storage and handling charges, and that the. plaintiff would be placed in just as good a position as before.
The evidence submitted fails to establish that the Farm Board caused, or was responsible for, any loss which plaintiff may have sustained, and the far greater weight of evidence of record shows that Chairman Legge of the Farm Board did not at any time make the alleged statements or representations to plaintiff’s president. A careful study of all the evidence submitted, hearsay as well as competent evidence, shows that the most Chairman Legge ever said to plaintiff’s president, or any representative of plaintiff, was, in substance, that the Farm Board would do what it could to aid the grain cooperatives in a program designed to have a stabilizing effect on the market price for wheat. The alleged statements and representations of the chairman of the Farm Board to plaintiff’s president are claimed to have been specifically made shortly after the middle of January 1980. A recitation of some of the evidentiary facts disclosed by the record will suffice to show that plaintiff’s claim as to the alleged representations and promises of Chairman Legge is not sustained by any convincing proof.
On July 29,1929, the Farm Board invited representatives of cooperatives to a conference in Chicago to consider the creation of a national marketing agency to serve all such cooperatives in all wheat-growing areas in the United States. This conference lasted for some time and resulted in the incorporation in October 1929, under the laws of Delaware, of the Farmers National Grain Corporation with principal office in Chicago. All the stock of this corporation was owned and held by cooperative organizations, and plaintiff association was one of its stockholders. The corporation *680 acted as the agent oí its stockholders in their business dealings with the Farm Board, and also as a central selling agency of the cooperatives. The Farmers National Grain Corporation was not an agent of the Federal Farm Board, nor were any of the stockholders, including plaintiff, at any time an agent, or agents, of the Farm Board.
August 15, 1929, the plaintiff through its president, Mr. Duis, appeared before the Farm Board to urge the granting of loans to cooperatives by the Board supplemental to 75 percent of the market value which plaintiff could then procure on warehouse receipts from the Federal Intermediate Credit Banks in order to enable plaintiff to advance 85 percent of the existing market value of its wheat to its members instead of 10 percent as theretofore. Such loans by the Board were authorized by section-7 (a) (5) of the Agricultural Marketing Act. Thereafter, the Farm Board authorized supplemental loans, in addition to primary loans, to plaintiff and to other cooperatives on the basis of 10 cents a bushel for wheat, provided the total amount loaned, including the primary loans, did not exceed one dollar a bushel.
The financial panic which occurred late in October 1929 affected particularly the market for stocks and bonds, and for grains. September 12, 1929, plaintiff made a formal written application to the Farm Board for a supplemental loan of $500,000 to be used in making supplemental advances of 10 cents a bushel to its members. In connection with that application, plaintiff, through its president, informed the Board, among other things, that “There is a recognized congestion in the terminal markets in our territory which is manifestly depressing prices below normal values and will retard a reasonable price advance so long as it continues. This makes it extremely desirable to keep back as much wheat as possible.”
September 24', 1929, plaintiff telegraphed the chairman of the Farm Board urging the Board immediately to establish a stabilization corporation under the emergency authority conferred by section 9 of the Agricultural Marketing Act in an effort to prevent a further decline in wheat prices; This telegram in part was as follows:
*681 Markets at terminals are dead. Prices are continually falling. Wheat is away below cost of production and farm problem is growing more acute on account of falling prices. This condition can be remedied only by Farm Board. Immediate establishment of a stabilization corporation with power to purchase some wheat will solve the difficulty. The effect of such corporation would be instantaneous, if they bought just a little wheat. Prices would improve not less than twenty cents per bushel. A sure profit would be made by stabilization corporation.
The Farm Board and Chairman Legge were opposed to the establishment of a grain stabilization corporation at that time. Plaintiff’s president was firmly and strongly of the opinion that the Farm Board should inaugurate a definite program and use so much of its authorized fund of $500,-000,000 as might be necessary to hold wheat off the market through the cooperatives and a grain stabilization corporation for such length of time as might be necessary to maintain and improve prices and that the Farm Board should assume the cost of such a program, but this view was not the view of the Farm Board and its chairman.
As a result of pressure from wheat cooperative organizations, including plaintiff, the Farm Board in order to enable the cooperatives who so desired to withhold their wheat from the market offered to make loans at fixed values, which values were the market value on that day. These values ranged downward from $1.25 a bushel for No. 1 Northern Spring Wheat, basis Minneapolis, to $1.12 for No. 1 Durum, basis Duluth, depending upon the quality, grade, and terminal basis. This decision to make loans at fixed values was reached by the Board at a meeting during a period of a few days immediately prior to October 26, 1929, which meeting was attended by representatives of certain wheat cooperatives, including Mr. Duis representing the plaintiff, and at that time it was expressly stated by Chairman Legge and was understood by all present that the borrowers, i. e., the cooperatives, would be responsible for all carrying charges on all wheat held by them. Chairman Legge expressly stated at that time to the representatives of the cooperatives, including plaintiff, that in ob *682 taining loans from tbe Farm Board at the fixed loan prices it was up to the cooperatives in making advances to farmers on grain to make proper deductions from the fixed loan prices to cover the costs in between and that if they did not do so it would be just too bad for them.
On November 2, 1929, plaintiff applied to the Farm Board for- additional supplemental loans not to exceed $2,000,000 on the basis of the fixed loan values so established, such loans to be made from time to time as wheat was delivered to plaintiff by the farmers during the 1929 crop season. Plaintiff’s application was approved by the Board November 6, 1929, and, on the same day the Farm Board by Mr. McKelvie, a member, sent plaintiff a telegram as follows: “In that loans which you are now receiving represent practically the full market value of current wheat prices, we strongly urge that you limit your advance to growers within safe reserve for operating expenses.” This telegram was in conformity with the position definitely taken and the view expressly announced by Chairman Legge at the time the fixed loan values were agreed upon by the Board and grain cooperative associations about October 26, 1929. This view of Chairman Legge was unvarying at all times. The term “operating expenses” as used in this telegram included, and is generally understood in the grain trade to include, all expenses incurred in marketing wheat, such as handling, interest, storage, freight, and other such expenses from the time the wheat is received by the cooperative until it is sold and delivered to the buyer.
Supplemental loans were thereafter secured by plaintiff from time to time during the crop year of 1929 in accordance with its application of November 2. At the time of each such loan, plaintiff executed its promissory note in favor of the United States, which note was secured by a lien on plaintiff’s wheat subject to the prior lien of the Federal Intermediate Credit Bank, or other commercial banks from which primary loans had been secured. Under the terms of these promissory notes plaintiff became liable for any deficiency arising thereunder after application *683 toward payment of tbe notes of the proceeds of sales of wheat, less certain charges therein specified.
At the time the Farm Board made announcement on October 26, 1929, that it would make loans at fixed values, as hereinbefore stated, the Board stated its belief that, based on known world supply, the then prevailing prices for wheat were too low; that this unsatisfactory price level was due chiefly to the rapid or disorderly movement of wheat to the market, and that the remedy lay in a more orderly marketing; that the fixed loans were being offered by the Board in order to assist wheat farmers to hold back their crops, and, at the same time, to have money with which to pay their obligations; that the loans would be carried on that basis until the close of the marketable season. The Board did not direct, or attempt to direct, the plaintiff or any cooperative as to the handling of their wheat or as to the length of time it should hold its wheat, or when it should sell it. The plaintiff and all other wheat cooperatives securing supplemental loans on the fixed loan values were at liberty to dispose of their wheat in any quantity or at any time when, in their judgment, it might be advisable so to do.
Plaintiff sold only a small portion of the wheat received by it after November 1, 1929. Most of the wheat so received by it from farmers was held until June 25, 1930. Plaintiff and its president were of the opinion that, by so doing, better prices would'be obtained therefor. This opinion was expressed by plaintiff’s president in a written notice to plaintiff’s field men on December 12, 1929, wherein he stated, among other things, as follows:
From now on, there will be more or less agitation in the papers about regional cooperatives or other super-organizations with a sort of intimation that our Association might be called on to go out of business. I hope that you and all whom you may come in contact with will not be frightened by any of these so-called super-organizations.
Our Association is in business to stay. We are absolutely the only Association ever organized that has and can perform an orderly marketing program, one that is wholly controlled by the farmers themselves. I *684 feel that sentiment for our organization is growing daily in this territory. Every other organization that I know of contemplates a buying program. A buying program will always mean a dumping program. The merchant or the Association that buys must sell immediately. That is not our method.
At this time, we have more wheat on hand than we ever had in a similar pool and we expect to hold this wheat until next su/mmer, if necessary, for a better price and any advantage that may come from a better price goes to our members to the last cent.
* * * $ *
All we need is loyalty by our members and profitable results can be guaranteed. * * *. Our objective is only one — to get a better price for the grain we handle considering the cost of production. We want a profitable agriculture; we have spent about eight years in establishing ourselves in this region and I make the prediction that when the smoke clears away we will be in the field stronger than ever before, because our foundation is sound. We have been teaching honest cooperation and we are strictly maintaining that principle.
I want to urge you to get all the members possible. Secure all the deliveries at as early a date as possible. The time may come when we cannot make the advance [to farmers] we are making now. Wheat has been dropping in the face of the advances that have been made. We have ample storage in Duluth and Minneapolis and can store a lot more grain so there is no reason, particularly, why the farmer should heep his stuff on the farm when he can receive the marhet price and still have an interest in the grain. [Italics supplied.]
On December 20, 1929, plaintiff issued Bulletin #70 to its field representatives in which the following statements, among others, were made:
In some parts of the state our men have been doing a business far beyond our expectations and it is possible that time has not permitted them to fully discuss the policies of the Association and there has, perhaps, been a lack of understanding by new members relative to their duties to the pool. We have repeatedly warned our men to make it plain to members who have pledged themselves to the pool that:
*685 1. When pledging themselves on the marketing agreement, members must understand that they are pledging their wheat with the pool for the next five years.
2. That we expect them to deliver all their salable wheat to the pool during the period of the contract.
3. That they must expect no further advance on their 1929 crop until final settlement, which may not be until sometime next fall.
There is no use in getting members with the understanding that they will receive an additional payment this coming February or March and another in July, as has been reported to us that some of our representatives are promising. This is erroneous and must not be practiced as it will only get you and the Association in bad. There is no need of cmy misrepresentation at this time as the Association is doing more for its members now than we ha/ve been able to do in the past and in fact home been advancing members practically the market price of their wheat. Members must understand that they cannot expect any additional payment until final settlement for if such were the case, the Association would be compelled to sell its wheat at the present low price.
We at no time have published any facts relative to the wheat which the Association has on hand as we do not consider that good business as this may be brought to the attention of the Grain Trade and we want to keep them in the dark as much as possible as far as our selling is concerned. However, I want to gwe you a confidential tip that the Association has a a very large volume of wheat on hand at this time and is not making rrmch of an effort to dispose of it at the prevailing low prices and ypu can, therefore, counsel members and prospects that this is an opportune time for them to profit by placing their wheat in the pool. [Italics supplied.]
The withholding of grain from the market by plaintiff, which was made possible by the establishment by the Farm Board of fixed loan values, tended to strengthen somewhat the wheat market during the month of November and part of December 1929, and the market price held above the fixed loan values during that period. However, the market prices varied from day to day. December 19, 1929, the Farmers National Grain Corporation, which dealt only with grain cooperatives, made and posted offers to buy wheat at the loan value, but no wheat was obtained. When *686 the offer was repeated again in January 1930, some wheat was acquired. Plaintiff did not accept either of these offers of the Farmers National Grain Corporation, principally because the market price at the time the offers were made was above the fixed loan values. Nor did plaintiff sell any of its wheat on the open market. Had plaintiff sold its wheat at the time of these offers by the Farmers National Grain Corporation to that corporation or on the open market it would have suffered no loss.
Late in January 1930 there was again a sharp decline in the wheat market. The market price for wheat fell below the fixed loan values and never recovered. As a result of strong pressure from various sources brought to bear upon the Farm Board, the Board determined to attempt to stabilize the market by buying wheat, and, to that end, decided to authorize the organization of a stabilization corporation under section 9 of the Agricultural Marketing Act. This corporation, known as the Grain Stabilization Corporation, was organized under the laws of Delaware on February 10, 1930, and its membership consisted of the stockholders of the Farmers National Grain Corporation, such membership being evidenced by certificate. The Stabilization Corporation was a nonstock corporation. It operated entirely with the funds of the Farm Board. Immediately thereafter the Grain Stabilization Corporation commenced buying all wheat offered to it by wheat cooperatives at the fixed loan prices and, also, the buying of - wheat from others on the open market at the prevailing market prices. Plaintiff, had it so desired, could have sold its wheat to the Grain Stabilization Corporation at any time after its organization and plaintiff’s president was so informed. Had plaintiff so sold its wheat when the Stabilization Corporation was organized, it could have avoided any loss on account of interest, storage, and other carrying charges on its grain.
Chairman Legge of the Farm Board took an active part in the discussions and considerations leading up to the final decision of the Board to authorize the organization of a Grain Stabilization Corporation. The policy adopted by the Grain Stabilization Corporation of buying wheat from cooperatives at only the fixed loan prices and wheat on the *687 open market at the prevailing market price was in accordance with the views of the Farm Board, including Chairman Legge.
It was during this time, to wit, shortly after the middle of January and before January 19, 1930, that plaintiff claims its president had a conversation with Chairman Legge of the Farm Board at Chicago and that Chairman Legge at that time made the statements and representations to plaintiff’s president, upon which plaintiff chiefly relies in support of its claim, that the United States should reimburse it for the losses finally sustained by it when it sold its wheat to the Grain Stabilization Corporation June 25, 1930.
Both Mr. Buis, plaintiff’s president, and Mr. Legge, who was chairman of the Farm Board until March 6, 1931, are deceased, and we are without the benefit of testimony from them in this case. Mr. Legge died December 3, 1933, about 2% years before the approval of the Joint Kesolution referring plaintiff’s claim to this court. Mr. Duis died before any testimony was taken in the case.
Most of the testimony of plaintiff that Chairman Legge of the Farm Board made the claimed representations and promises to plaintiff’s president is hearsay, not supported by any documentary proof. But this hearsay testimony and the testimony which is not hearsay of plaintiff’s secretary and treasurer and another witness for plaintiff, who was not connected with plaintiff organization, is not convincing and, in our opinion, is refuted by other evidence in the record.
In addition to what has already been said above with reference to the position taken by the Farm Board and its chairman, and the expressed views of the Board and its chairman, we shall now discuss the testimony submitted by both sides relating to the question whether Mr. Legge did or did not represent to and promise plaintiff’s president about January 17 or 18, 1930, or at any other time, that plaintiff should continue to hold its wheat indefinitely and that the Farm Board would fully reimburse it for all costs, expenses, and losses that it might sustain by so doing, as hereinbefore more particularly stated at the beginning of this opinion.
The evidence of record which we consider to be of the *688 greater weight shows that prior and subsequent to January 17, 1930, the unvarying position of the Farm Board and its chairman, Mr. Legge, was that all carrying charges for the grain, which included everything that entered into the handling of grain, must be embraced in the operations of plaintiff as a borrower from the Farm Board of funds which it was unconditionally obligated to repay.
On January 19, 1930, a day or two after plaintiff’s president conferred with Mr. Legge in Chicago, at which time plaintiff claims Mr. Legge made the representations and promises hereinbefore mentioned, Mr. Duis wrote Mr. Taft, cashier of plaintiff, from Minneapolis, as follows:
Arrived here about noon today on a late train. Will go home Monday evening. Had a red hot session in Chicago. Will tell you about it when I reach home.
Had a talk with Mr. Legge and think we will get the additional advance. He will not be back to Washington until Tuesday morning. Have wired the Judge to see him then. Quit walking the floor until we are turned down.
We are going to be left alone as an association. Have it in writing.
' In view of the importance to plaintiff in its future operations of the alleged representations and promises of Mr. Legge and in view of the fact that such a statement would have been contrary to the announced policy of the Farm Board to plaintiff November 6,1929, and the expressed views and position of Mr. Legge, as previously stated by him to the representatives of the cooperatives about October 26,1929, we think it is significant that Mr. Duis made no mention in his letter to Mr. Taft of the representations and promises which plaintiff subsequently claimed were made by Mr. Legge. The “red hot session in Chicago” referred to in the above letter had reference to a conference which Mr. Duis had with the Farm Board members in Chicago with reference to an item of $48,000 in connection with plaintiff’s application of November 2, 1929, for a loan of $2,000,000 and to the applications of plaintiff which it then had before the Board for elevator facility loans of $95,000 and $100,000. The “talk with Mr. Legge,” to which Mr. Duis referred, had reference to these matters.
*689 Upon Mr. Duis’ return to Grand Forks, plaintiff’s Board of Directors bad a meeting at which Mr. Duis was present. At this meeting the Board of Directors discussed the future policy which plaintiff, as a cooperative wheat pool, would pursue in connection with the stabilization program of the gram cooperative associations, including the Farmers National Grain Corporation organized October 29, 1929, with the assistance of the Federal Farm Board, through supplemental loans to the cooperatives. One of the main purposes of the Farmers National Grain Corporation was to act as a marketing agency for the cooperative associations.
Plaintiff did not obtain its loans for supplemental advances to wheat growers through the Farmers National Grain Corporation for the reason that on July 16,1929, the day after the Farm Board was organized, plaintiff’s Board of Directors adopted a resolution authorizing its president to appear before the Farm Board and request the Board to advance to plaintiff, out of such funds as the Board might have at its disposal, an additional fifteen cents a bushel to be disbursed by plaintiff to farmer members at the time of delivery of wheat to plaintiff, making in all an advance of ninety cents. In September 1929 plaintiff made application for a loan of $500,000 and this loan was granted by the Board before the Farmers National Grain Corporation was organized. For this reason the subsequent loan of $2,000,000 to plaintiff was also directly made to plaintiff by the Board.
Several of plaintiff’s directors who were present at the plaintiff’s Board of Directors’ meeting January 23,1930, were called as witnesses by plaintiff and testified with reference to the report which Mr. Duis made to the Board in regard to his conference at Chicago. All of this testimony with reference to what Mr. Duis reported to the Board of Directors is of course hearsay. There is no evidence that any of the statements or representations alleged to have been made to plaintiff’s president by Mr. Legge were ever communicated to the Farm Board, and as all the evidence which is clearly competent and admissible and the findings we have made show that plaintiff has no legal or equitable claim against the United States by reason of any action of the Federal Farm Board, we discuss this hearsay testimony and the other testi *690 mony in the record with reference to the alleged representations and promises by Mr. Legge to plaintiff’s president only in connection with the provision with reference to a moral claim in the Joint Resolution of June 26,1936. The Resolution referred the matter of plaintiff’s claim to this court and directed the court to investigate the losses sustained by the cooperative associations to which loans were made during stabilization operations through withholding grain from the market and making advances to members in order to stabilize prices, for the purpose of determining whether, because of any agreement or understanding between any such association and any member, officer, or employee of the Federal Farm Board, or because of any other facts or circumstances, there is any moral obligation on the part of the United States to reimburse such association for the whole, or any part, of such loss, and to report to Congress the results of this investigation and determinations, together with such recommendations as the court deems appropriate. The question whether under all the facts and circumstances there is any moral obligation on the part of the United States is a matter for the determination of Congress. Our only duty is to report what we think the facts establish and give our reasons therefor.
Plaintiff’s witnesses, upon being asked to tell what Mr. Duis said at the meeting with reference to statements made by Mr. Legge, testified that plaintiff’s Board of Directors was somewhat undecided whether to go into the Farm Board’s stabilization program; that Mr. Duis thought it should, and, in urging that it do so, stated in substance to the directors that they did not need to worry at all; that he had gotten a guarantee from Mr. Legge that they, the cooperative associations, were going to come out all right and that Mr. Legge had assured him that plaintiff would get as good a price for its grain as anyone else; that plaintiff would be taken care of, and that all the charges and costs to which plaintiff had been subjected in storing the grain would be paid by the Farm Board and that plaintiff would be restored to its former financial standing. Upon further questioning by plaintiff’s counsel, these witnesses detailed what they understood would be the charges and expenses which the Farm Board would bear and for *691 which it would reimburse the plaintiff if the wheat which the plaintiff then had on hand and that subsequently secured from wheat growers of the 1929 crop was not finally sold by plaintiff for an amount, in excess of the advances which plaintiff had made to the growers, sufficient to take care of all storage and handling charges.
None of these witnesses was able to state exactly what Mr. Duis said in connection with what he claimed Mr. Legge had said to him, and they could not remember any exact statements made at the meeting by Mr. Duis. A careful study -of the testimony of plaintiff’s witnesses on this point shows that there was a difference of opinion among the members ■of plaintiff’s directors as to what policy the plaintiff should pursue and that the position of plaintiff’s president, Mr. Duis, was, as he had stated to plaintiff’s field men early in December 1929, that, although plaintiff had more wheat on .hand than it ever had in a similar pool, he expected to hold the wheat until the summer of 1930, if necessary, for a better price; that he believed at that time, in January 1930, the market price for the 1929 crop of wheat would go higher than the price which the Farm Board had fixed for the purpose of making supplemental loans as a result of the program which all the large grain cooperatives had agreed lipón, and who had intended to use the facilities of the Farmers National Grain Corporation and the assistance of the Federal Farm Board, as hereinbefore more particularly set forth. Mr. Duis and plaintiff knew that plaintiff could sell its wheat, or any portion thereof, at any time if it thought that course advisable. What Mr. Duis said at -the meeting represented, we think, his own idea of what the Farm Board should do and what he doubtless hoped ■and perhaps believed the Farm Board would ultimately do if the market price of the grain did not recover sufficiently to enable plaintiff to sell its grain at some future date with•out loss. The testimony of plaintiff’s witnesses with reference to what occurred at this January meeting shows that Mr. Duis maintained this position at the meeting and that he did state to the directors that he had assurances from •Chairman Legge that if the plaintiff, when it sold its grain, .sustained losses for storage and carrying charges after hav *692 ing made the supplemental advances to the growers, from, whom the wheat was received, the Farm Board would bear-these losses. But the testimony of all of plaintiff’s witnesses, when considered in the light of all the other evidence in the record, falls far short of establishing the fact that' Mr. Legge made these representations and promises to plaintiff’s president.
The written minutes of this January 1980 meeting of plaintiff’s Board of Directors, which are in evidence, cover about seven pages of closely typewritten matter and no reference whatever is made in those minutes concerning' any agreement between plaintiff and Mr. Legge or any representation or promise by Mr. Legge that the Farm Board would be responsible for and take care of all costs- and expenses for storage and other handling charges. We think it significant that a matter of so much importance1to plaintiff as a specific promise in that regard by Chairman Legge would have escaped being specifically mentioned' in the minutes. A lack of any such reference to the matter would seem especially significant in view of the position of Chairman Legge previously expressed by him about October 26, 1929, at a conference with representatives of the grain cooperatives, which was attended by plaintiff’s president, at which the fixed loan prices for wheat were agreed upon between such representatives and the Farm Board, and the statement in writing by the Board to plaintiff on November 6, 1929, on which date the Farm Board approved plaintiff’s application for supplemental loans of' $2,000,000, that, inasmuch as the loans which plaintiff was then receiving represented practically the full market value-of current wheat prices, the Board strongly urged plaintiff' that it limit its advance to growers within a safe reserve for operating expenses.
One of plaintiff’s witnesses, who prior and subsequent to January 1930 was plaintiff’s secretary and treasurer, testified that in the summer of 1930 he went to the Fargo, North-Dakota, Fair for the purpose of seeing Mr. Legge and talking to him about carrying charges because “we were worrying about holding this wheat and I, especially, wanted to-have assurance from Mr. Legge himself directly as to what. *693 his policy was going to be and if he was going to keep his promises to Mr. Duis.” This witness testified that he •saw Mr. Legge at Fargo and that “Mr. Legge assured me that all of these charges would be reimbursed and that the promises he had made to Mr. Duis would be carried •out.” The testimony of this witness is not convincing. The uncontroverted proof shows that the only trip which this witness made to Fargo was on July 17, 1930; that this was more than a month after the plaintiff had sold all its wheat to the Grain Stabilization Corporation operating with the funds of the Farm Board on June 25, 1930, which corporation, with the knowledge of and in accordance with the policy and position of the Farm Board and its chairman, Mr. Legge, had paid plaintiff only the fixed loan values for its wheat, which previously fixed loan values at that time were .higher than the existing market prices for wheat.
The other evidence offered by plaintiff in support of the claimed promises by Mr.' Legge to Mr. Duis in January 1930 is the testimony of a witness not based upon hearsay and who was in no wise connected with the plaintiff association. The .statements which this witness testified were made to him by Mr. Legge were not at any time communicated to plaintiff •or to any of its officers or employees. This witness testified that about February 7, 1930, he, by appointment, met Mr. Legge at Madison, Wisconsin, and had a discussion with him .about the question of the association, of which he was general manager, carrying wheat in storage; how long it was to be •carried, and who was to sustain the loss; that Mr. Legge told him to carry the wheat in storage until ordered out by the Farm Board; that this was the Farm Board’s program and they would see the cooperatives through, protect them against loss. This witness further stated that he could not remember the exact statements of Mr. Legge and would not attempt to ¡state just what Mr. Legge said to him. On February 22, 1930, fifteen days after the conversation between this witness and Mr. Legge at Madison, this witness wrote a letter to the chairman of the Stabilization Corporation at Chicago, as .follows:
With reference to our telephone conversation of today relative to money loaned on country elevator storage *694 tickets, based on the government price of $1.25 per bushel, I am enclosing herewith the schedule which we were using up to February 10th for making loans at the full price on all grades of Spring Wheat and Durum.
From the basic price of $1.25 we deducted 80 per bushel and freight, the deductions agreed upon in discussions with Chairman Legge and Governor McKelvie-The 80 had nothing whatever to do with storage charges. At the time we began making the loans, May wheat was 80 over, and we figured that with the 80 carrying charge and the 80 deduction, that 160 to May or June was adequate to take care of everything.
As the grain crop moved and the trading was carried on, the 80. carrying charge has been entirely eaten up by somebody else, and that accounts for our difficulty. The question now arises as to whether we should close out the loans made prior to February 10th for the purpose of eliminating possible losses which may be sustained by constantly accruing storage charges.
Your operations at the present time and for some time past cover the purchase of grain at a basic price of $1.25' per bushel, to which price must be added commission for buying, interest for carrying the grain, and storage and elevator charges. It seems the height of inconsistency that the loans made prior to February 10th should be closed out when you are buying cash grain with those carrying charges. If this were done, the elevators buying the storage tickets would sell the May future as a hedge.
In addition to the facts recited above, the psychological effect would be most damaging to the Farm Board program, and there would be doubt as to the business judgment of the National Grain Corporation and member Associations. The buying of grain on the one hand and the forcing the sale of grain through the closing out of the loans on the other would place us in a ridiculous posi-' tion with the grain trade and, no doubt, cause untold damage to the farmer’s state of mind.
I think it would be a fatal policy to close out the loans; it would be a complete repudiation of the agreements we made with the farmers when making the loans. If we do close out the loans, we will have to pass the “buck” squarely to the Farm Board and state that the-stabilization operations were not to be carried out, that our Association is obliged to take this action to stop further loss from falling upon us.
We took 80 out of the farmer’s loan, and you took nothing out of the purchase — rather, you were adding. *695 interest, storage, and elevator charges, as well as commission on the purchases.
I have given this a great deal of study and it is pot only my recommendation, but it is my urgent request that immediate arrangements be made for the Stabilization Corporation to take over these loans, liquidate them at the end of the season, or close them out when a point is reached that will eliminate a loss. If any loss does accrue, that loss is entirely due to storage charges. Surely, that is within the law and the purpose of the Stabilization Corporation.
I am anxious to have this matter determined at the earliest possible moment as each day means a great deal to this Association.
Up to February 10th we had made loans on about 700,000 bushels of Wheat and Durum, and the deduction of 80 was to cover overhead expense of 10 per bushel, 8%0 redelivery charges, and 3%0 interest, so you can see that the question is one entirely with respect to storage charges and one which I took up last fall with Chairman Legge and Governor McKelvie and received their approval thereon.
Copies of this letter were sent to Mr. Legge, the chairman of the Farm Board; Mr. Huff, the president of the National Farmers Grain Corporation; and Mr. McKelvie, a member of the Farm Board. The testimony of this witness is not convincing in view of a letter sent by Mr. Legge and Mr. McKelvie to the Farmers National Grain Corporation, which is as follows:
Mr. Thatcher has sent Mr. Legge and me a copy of his letter to you of February 22nd relative to advances he made to his members on the loan basis announced on October 26 th. Storage is a charge that must always be taken into account, and when Mr. Thatcher failed to do that, he failed to observe the caution urged upon him by the members of the Federal Farm Board, namely, that advances to growers should take into account freight and other ordinary handling charges.
If Mr. Thatcher and his members have carried their grain as long as they wish to at their own expense, they can turn it over to the Stabilization Corporation on the basis that the loans were made. This, however, is not to include wheat amounting to some four hundred thousand bushels, that I understand Mr. *696 Thatcher bought from sources other than his members.
You may pass this word along to him as expressing the opinion of both Chairman Legge and myself.
This letter was signed by Mr. McKelvie, but it was written with the knowledge and express approval of Chairman Legge.
The evidence shows that before the last-quoted letter of February 26, 1930, was written, the matters set forth in the letter of February 22, 1930, were discussed between Mr. Legge and Mr. McKelvie and that the letter of February 26 expressed the position of Mr. Legge in regard to carrying charges on cooperative wheat. A copy of this letter was mailed to this witness March 6,1930.
March 22,1930, the Farm Board reduced the loan value of wheat at certain terminal points and the Farmers National Grain Corporation so notified all its stockholders, including plaintiff, and at that time the Grain Corporation also notified them in writing that “All loans to producers on these values must be less interest, storage, and insurance to July 1, and all other charges, including freight, handling, taxes and commission. If the loan is called any time after May 1, borrower will be reimbursed for any interest deductions.”
May 21, 1930, the Federal Farm Board, at a meeting in which Chairman Legge participated, adopted a resolution authorizing the Grain Stabilization Corporation to buy all wheat of cooperative associations at the fixed loan values, and, in that resolution, there was provided, among other things, as follows:
Under the terms of the loan, the association [that is, the cooperative] must pay all carrying charges of every kind and description, including interest, storage, insurance, freight, custodian fees, up to, and including, the date it executes an agreement to deliver its wheat hereunder, and such agreement is accepted by the Grain Stabilization Corporation.
June 26, 1930, plaintiff executed an agreement with the Grain Stabilization Corporation whereby plaintiff sold all its wheat on hand to that corporation at the loan values theretofore fixed by the Board on October 25, 1929, under the stipulation that “so much of the purchase price as shall *697 be required shall be used to pay all indebtedness of the association [plaintiff] collateraled by such wheat to primary lenders, if any, and to the Board [Federal Farm Board] and/or Farmers Corporation [Farmers National Grain Corporation] after which the balance, if any, shall be paid to the association,” and with the further agreement that “The association shall be entitled to have refunded to it all storage, interest, insurance, and other charges heretofore paid by it, or deducted from the loan made to the association by the primary lenders, if any, the Board and/or the Farmers Corporation on such grain which home not accrued, at the date of the agreement.” [Italics supplied.]
The price paid, to wit, the fixed loan values of October 26, 1929, by the Stabilization Corporation to plaintiff was not sufficient to pay in full the primary and supplemental loans obtained by plaintiff on the wheat after deducting storage, interest, insurance, custodian fees, and other carrying charges up to the date of sale. The withholding of grain by plaintiff caused it to incur excess storage, interest, custodian fees and insurance charges which it would not have incurred had it disposed of the grain from time to time during the crop year as it might and could have done, as hereinbefore mentioned, in an orderly manner. In withholding the grain plaintiff did so without any agreement, express or implied, from the Farm Board or any officer or employee thereof that plaintiff would be reimbursed for all advances made to growers and all other carrying charges to the date of sale, and without any order, direction, or compulsion from the Farm Board, or any officer or employee of the Board, that it do so. The excess cost so incurred by plaintiff in withholding its wheat during the crop year 1929 until June 25, 1930, was $222,945.20. The fixed loan values which the Grain Stabilization Corporation paid plaintiff for its wheat on June 25, 1930, were greatly in excess of the then market price at which plaintiff could have sold its grain on the open market at that time.
After sale by plaintiff of all the wheat held by it to the Grain Stabilization Corporation, plaintiff thereafter computed the costs incurred by it during the crop year 1929 in excess of the total amount received from the stabilization *698 corporation for the grain at $201,820.44, and, prior to January 17, 1931, made claim on the Farm Board therefor. At a meeting of the Farm Board on January 21, 1931, at which Chairman Legge was present, the Board discussed and considered the claim of plaintiff for losses on the wheat sold to the Grain Stabilization Corporation and denied the same. The Board adopted a resolution directing the secretary of the Board to advise plaintiff in writing, in part, as follows: “If your claim forwarded to us is based upon any supposed obligation of the Federal Farm Board to pay any part of your operating interest or handling charges arising from your Association’s transactions in wheat in 1929, the Board does not recognize any such obligation from it to you and definitely disclaims any understanding or agreement, express or implied, that it would meet any such costs or charges.”
Subsequently at a meeting of the Board on June 25,1931, at which Chairman Legge was present, plaintiff’s president, Mr. George E. Duis, appeared before the Board in a further effort to have the Board bear the losses which plaintiff had sustained and the Board discussed with him at length the events in connection with the Board’s loans to plaintiff on wheat of the 1929 crop, the controversy between plaintiff and the Grain Stabilization Corporation in connection with storage and other carrying charges on the 1929 wheat which plaintiff sold to the Grain Stabilization Corporation in June 1930 and, also, means whereby the Association’s affairs might be straightened out with the assistance, of the Farm Board. In that connection Mr. Duis claimed that plaintiff’s difficulties were the result of the Board’s activities and that plaintiff was in effect acting as the agent of the Board and that, therefore, the plaintiff should be assisted in its marketing by the Board. The Board at that time denied any responsibility for present conditions of plaintiff’s affairs.
In connection with plaintiff’s claim to the Farm Board for the losses sustained by it, Mr. Legge positively denied that he had made any promises to or agreement with plaintiff regarding carrying charges of plaintiff’s wheat during the 1929 crop year.
*699 dependant’s counterclaim
The record shows that on July 10,1930, plaintiff executed a promissory note in favor of the United States for the principal sum of $2,661,411.06 with interest thereon at the rate of 1% percentum per annum from July 10 until paid. Plaintiff has paid $2,463,830.95 on account of the principal on this note and there remains due and unpaid $197,580.11 on account of principal and interest thereon at 1% percent from March 31,1932, less $356.79 heretofore paid on account of interest accruing after March 31, 1932. This obligation of plaintiff is not barred by any statute of limitation for the reason that no statute of limitation runs against the United States. Redfield v. Parks, 132 U. S. 239; United States v. Beebe, 127 U. S. 338; United States v. Thompson, 98 U. S. 486; United States v. Whited & Wheless, 246 U. S. 552; Chesapeake & D. Canal Co. v. United States, 250 U. S. 123; United States v. Nashville, C. & St. L. R. Co., 118 U. S. 120; Metropolitan R. Co. v. District of Columbia, 132 U. S. 1.
The foregoing findings of fact and opinion will be certified to Congress in accordance with the last paragraph of the Joint Resolution of June 26,1936. It is so ordered. '
Madden, Judge; Green, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge; took no part in the decision of this case.